LANCASTER COUNTY ET AL., APPELLEES, v. LINCOLN AUDITORIUM ASSOCIATION ET AL., APPELLANTS.

FILED JUNE 10, 1910.    No. 16,074.

1. **Corporations: POWERS: LEASES.** A corporate body having power to execute a lease of property for 25 years has equal power to cancel the lease with the consent of the lessee, and to execute a new lease for a longer term to another lessee.

2. **Counties: Contracts: Discretion of County Board.** In the absence of fraud or collusion, a contract made in good faith by a board of county commissioners on behalf of the county within their powers may not be interfered with by the courts merely because they may be of opinion the county board might have made a better bargain.

3. ———: ———: ———. The direction of county affairs is committed to the proper officers of the county, and, in the absence of bad faith or a gross abuse of discretion amounting virtually to such, their proceedings, if regular, may not be reviewed and set aside by the courts in a collateral action by a taxpayer.

4. **Corporations: Surrender of Lease: Suit to Set Aside: Estoppel.** A stockholder in a corporation whose directors have surrendered a lease upon certain real estate, who at the time advocates such surrender, and who, having knowledge that the new lessee is expending large sums of money in repairs and improvements, remains silent four years before bringing an action as a stockholder to set aside the surrender for want of power in the directors, is estopped to maintain such action.

5. ———: Powers: Leases. A corporation authorized to hold real estate in fee may become lessee in a lease whose term exceeds the term of its charter existence.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE. *Affirmed as modified.*

*Hall, Woods & Pound* and *Strode & Strode,* for appellants.

*Walter J. Lamb* and *F. M. Tyrrell, contra.*

LETTON, J.

This action was begun by the county of Lancaster against the Lincoln Auditorium Association (hereinafter called the Association), Elmer C. Rewick, and the Lincoln Amusement Company, the object being to cancel a lease, dated February 20, 1903, executed by the county to the Union Commercial Club (hereinafter called the Club) of Lincoln, Nebraska, of three lots in Lincoln upon a part of which the auditorium building stands; to set aside the interest of Rewick and the Amusement company in the premises; to recover rent and damages, and for the

appointment of a receiver. Later, Walter J. Lamb intervened, alleging that he was a taxpayer of the city and a stockholder of the association; that he was the owner of a large apartment building adjacent to the auditorium building; that a lease which was made by the county to the association on September 1, 1899, contained certain conditions for the benefit of the public (which will be referred to hereafter); that this lease was canceled by the county board and the association on February 20, 1903, and that the cancelation of this lease and the execution of a new lease to the club on the same day were *ultra vires*, illegal, and void, and so likewise was a transfer thereafter made of the last named lease by the club to the association. He alleges further the maintenance of certain specified nuisances in the auditorium building whereby he has been damaged in the occupancy and renting of his adjacent property, and prays for a decree canceling both leases, for an injunction restraining the maintenance of the nuisances specified and for general equitable relief.

The answer of the association to this intervention is virtually a general denial, with a plea that the intervener is estopped to complain, for that the last lease was entered into by the parties with his knowledge and consent, and under his legal advice and direction, and that he was fully aware of changes and alterations made in the building from time to time, but made no objection thereto. Its answer to the petition pleads the validity of the several leases, the expenditure of large sums of money upon the property in reliance upon these instruments, and the acceptance and retention of rent by the county under the second lease.

A large volume of testimony was taken. At the conclusion of the trial the district court made special findings of fact and conclusions of law covering 27 typewritten pages, which it would serve no good purpose to set forth at length. In substance, the court found that the cancelation of the first lease and the execution of the

second was unauthorized, and that the intervener was entitled to relief as to the nuisances. The second lease was set aside, the petition of the county dismissed, no allowance was made to the association for improvements, and judgment for damages was entered in favor of Mr. Lamb against the defendants. The defendants were also enjoined from operating a skating rink in the building and from using a "Military Band Organ" in connection therewith, and from permitting certain obnoxious performances therein. From this decree the county took no appeal, so that the adverse decision upon its petition is final. The defendants appeal from the decree in favor of the intervener.

A summary statement of the facts found by the district court must be made in order that the cause may be understood. In September, 1897, the citizens of Lincoln at a public meeting resolved to erect a public hall for the purpose of holding political and other public meetings. The parties interested by public subscription raised the sum of about $10,000. To better accomplish the purpose, the Lincoln Auditorium Association was organized as a corporation, the date of its beginning being the 12th day of October, 1897, and its termination being fixed in its articles as January 21, 1905, the expressed powers of the corporation being to manage and control the auditorium building and to buy and sell lots and rent the real estate necessary. On September 1, 1899, the first lease was entered into between the county and the association for the term of 25 years. Among the agreements therein contained were that the association at its own expense should within 12 months from the date of the lease build and furnish an auditorium capable of seating at least 3,400 people, to cost not less than $15,000; that the building should be kept in repair by the association free of all charge to the county; that the association should pay all taxes and assessments; that the building should be furnished free for county and district conventions, and at actual expenses for city conventions; that at the termina-

tion of the lease the building, fixtures and appurtenances should become the property of the county; that the building was to be rented for other purposes at reasonable charges, and that the county was to receive one-half of the net receipts. It also contained a number of other conditions not necessary to set forth at length.

The building was erected in 1899, and used as designed until the 20th of February, 1903. The association, however, became financially embarrassed, was unable to make expenses, and paid no revenues to the county. In October, 1897, The Union Commercial Club was organized as a corporation, its corporate existence fixed to terminate June 12, 1948. Some time in 1903 it was proposed to erect a building for this club upon a portion of the leased property. Mr. Lamb, the intervener, who is an attorney of experience and ability, advocated the selection of this site and the securing of a lease from the county to the club for a period of 50 years, and advised the club that the county authorities had power to execute such a lease. The old lease was canceled and a new lease executed to the club for a term of 50 years at an annual rental of $350, payable January 1 of each year. By the terms of the new lease the club was given the right to build a brick building on the lots for a club house, but not required to do so, and at the expiration of the lease all the buildings on the premises were to remain the property of the club, with the right to remove them at the termination of the lease. The project fell through and the club building was never erected.

The principal difference between the leases is that in the later one a fixed sum is to be paid annually as rent and the building does not become the property of the county at the end of 25 years. Some minor details, mainly concerning the public interest, are also omitted which will be referred to later. Both contain strict provisions for forfeiture if the lessee fails to carry out the conditions, provide for repairs, payment of taxes, use of building, etc.

.The Union Commercial Club was succeeded by the Lincoln Commercial Club, and in January, 1904, that club, in consideration of the association assuming the obligations of the lease of February 20, 1903, and paying all back rent due the county, assigned and transferred to the association all its rights under the lease.

The matter of leasing the lots was never submitted to a vote of the people of the county, and there is no proof that the action of the board of directors of the club in accepting the first or transferring the second lease was ratified by the stockholders.   The association has been in charge of the building since 1903, and the defendant Rewick has been the general manager of the building, and since January, 1904, had constituted the Lincoln Amusement Company.   While Mr. Rewick was in charge of the building it was used as a roller skating rink, a large and noisy "Band Organ" was played in the evenings, and at certain times amusements were carried on therein which annoyed Mr. Lamb and interfered with his tenants in the adjoining building.   The defendants have expended on the auditorium building and grounds and have paid out for paving and assessments over $7,500.

Both the defendants and intervener, who are the only parties appearing here, agree that the lots in question upon which the auditorium building is situated were not "public grounds" of the county, and that the board of county commissioners had the power, without first submitting the question to a vote of the electors of the county, to enter into the first lease, and afterwards, with the consent of the lessee, to cancel and set aside the same and release the property for the term of 50 years.   This seems also to have been the view taken by the district court, since it upheld the first lease.   But the intervener takes the position that the 50-year lease is void because under the first lease the building became real estate when built and belonged to the county and the county authorities could not give it away; because the Commercial Club had no power to enter into it, in that the lease was for a

term beyond its coroporate existence; and, further, because of the failure to erect a club house, which he asserts was part of the consideration.

As to the county commissioners "giving away" the real estate of the county: Under the first lease the county was receiving no revenue, and if the same conditions continued it was not improbable that at the end of the term all it would have to show for the use of the lots would be a building 25 years old, unsuited for county purposes, of uncertain value, while, under the new lease, it receives the sum of $350 a year for 50 years. The board may have erred in judgment in looking at the matter, and may have made a bad bargain, but there is no fraud or collusion shown, nor has there been a gross abuse of discretion established. The direction of county affairs is entrusted by law to the county board, and not to the courts. Neither are infallible. It is probable that, where no sinister influences are shown to exist, county affairs may in the long run be best administered by the men chosen by the people for that express purpose. While the intervener and other citizens of the county may be possessed of business acumen which would prevent them making such a contract, we are of opinion that it is not void for want of consideration. *Getzschmann v. Board of Commissioners,* 76 Neb. 648. Moreover, under the new lease the improvements, not being county property, are liable to taxation for county and other purposes, and this feature, among others, may have appealed strongly to the board.

As to the right of the parties to cancel the first lease: The association is a private corporation. Prior to the cancelation of the first lease it had carried on its business at a loss and was seriously embarrassed. There is no law which compelled it to operate and carry on business at a loss, since it was not a public corporation. Its activity in behalf of the public was purely voluntary, and was not imposed by any law or statute. It had no power to appropriate private property to its own use against the will of the owner, but was in all respects a private corpora-

tion, though carrying on a *quasi* public enterprise. It had the same rights and duties as the owner of any other public hall or public meeting place, save as modified by its articles and by the terms of the lease. It had the same right, therefore, to transfer or otherwise dispose of its lease with the consent of the lessor that any other person or corporation has, and the rules applicable to public corporations with respect to compelling them to perform their corporate functions have no application. The action of the board of directors in canceling this lease in January, 1903, was acquiesced in by all the stockholders of the association. The intervener, with full knowledge of the fact, took an active part in advising the club to accept the 50-year lease, and never objected or raised any question as to the power or authority of the county commissioners to cancel the first lease or the directors of the club to execute the second until July, 1907, more than four years later. The moving cause of his objection then made seems to have been his desire to put a stop to the music of the "Military Band Organ" whose delectable sounds furnished accompaniment to the roller skaters, and to prevent the roars of the lions in Hagenback's animal show from disturbing his tenants and himself.

We are of opinion, therefore, that, so far as the right of Mr. Lamb to object to the surrender of the lease as a stockholder in the association is concerned, he waived the same by remaining silent during the long period within which the club, and its assignee, the association, within his knowledge expended large sums of money upon the building and lots. Indeed, upon the oral argument he virtually conceded that it was not the impairment of his rights as a stockholder in the association of which he complained, but of his rights as an adjacent property owner to be free from nuisance, and of his interest as a subscriber to the auditorium building fund that the property be not diverted from the use for which the money had been subscribed by the public. He was an active participant in

the proceedings which led up to the cancelation of the
first lease and the making of the second, an ardent advo-
cate at public meetings of the cancelation of the old lease
and the making of the new, and he testifies himself that
he urged the county to decline to make the second lease.
Under these circumstances we think Mr. Lamb is in no
position to complain either of the action of the county
commissioners or of the directors of the Commercial Club
on this account.

The new lease by its terms expires on February 20,
1953. The charter of the Commercial Club terminates
January 1, 1948. The lease, therefore, is for a period of
about 5 years longer than the corporate existence of the
club. This it is contended makes the lease void. We see
no reason why this should be the case. There is nothing
to prevent the Commercial Club from amending its char-
ter so as to extend the period of its corporate existence,
and, being authorized by statute to purchase real estate
in fee simple for specific purposes, it may acquire any
lesser estate or interest which is vendable. If the club
was authorized to hold and own property in fee, it is clear
that it may hold a lesser term extending beyond its cor-
porate existence. The lease is certainly valid for the
term of the corporate existence of the club and for the
full term if this existence is renewed. *Brown v. Schleier,*
118 Fed. 981; *Detroit v. Detroit Citizens Street R. Co.,*
184 U. S. 368; *People v. National Trust Co.,* 82 N. Y. 283;
*Hill v. Atlantic & N. C. R. Co.,* 143 N. Car. 539, 55 S. E.
854.

The second lease has been assigned to the Auditorium
Association, of which Mr. Lamb is a stockholder. If its
terms are more advantageous to that association than the
terms of the first lease, the change was for his benefit, and
he has no standing in court to complain on that account.
As a matter of fact, whatever position he took in the dis-
trict court, the only serious complaint which he makes
here as to the cancelation of the 25-year lease is that in
the new lease some of the provisions of the first lease

which he considered to be for the public benefit and necessary to carry out, preserve and effectuate the purpose and intention of the original subscribers to the building fund have not been incorporated. Both parties seem to agree that the decree of the district court should be modified so as to reinstate the 50-year lease, to continue the injunction as to the offensive practices complained of, and to provide, further, for the better protection of the purposes for which the money was subscribed by inserting in the decree provisions of the first lease, which were omitted in the second one.

This being so, the decree of the district court is accordingly modified as follows: That portion of the decree setting aside the second lease and reinstating the lease of January, 1897, is vacated. The lease of February 20, 1903, is declared to be a valid instrument in all respects, and the injunction heretofore granted is continued in force. It is further ordered and decreed that the lessee shall keep the buildings on the said premises insured for their full value in responsible insurance companies, and in case of loss by fire or other agency the money derived from insurance policies shall be used for the re-erection of the buildings thereon within 18 months after the loss; that it shall keep the portion of said lots not occupied by the auditorium building in a neat and park-like condition and free from all buildings and structures, except by the consent of the board of commissioners of Lancaster county; that the lessee shall not allow any intoxicating liquors to be sold on said premises or allow any gambling or any other immoral or unlawful practices or anything calculated to injure the reputation or impair the value of said premises or the adjacent property of the neighborhood; that the lessee shall not assign the lots or underlet the premises without the consent of the county board of Lancaster county in writing, and no mortgage lien or other incumbrance shall be placed against said lots or the improvements and buildings thereon. It is further ordered that the judgment in favor of the Auditorium As-

sociation against Lancaster county be set aside, and that in all other respects the judgment of the district court be affirmed; each party to pay his own costs in this court.

JUDGMENT ACCORDINGLY.